**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**ELMER LEON CARROLL,**

      **Petitioner,**

**v.**                                                     **CASE NO. 6:05-cv-857-Orl-31KRS**

**JAMES V. CROSBY, JR., et al.,**

      **Respondents.**

_____

**<u>ORDER</u>**

**I.      Introduction**

In the early morning hours of October 30, 1990, Christine McGowan (age 10) was brutally raped and murdered.  Shortly thereafter, Elmer Leon Carroll (Petitioner) was arrested and charged with first degree felony murder and sexual battery on a minor.  He was found guilty as charged on March 21, 1992.[1]  Three weeks later, following the penalty phase, the jury recommended death by a vote of twelve to zero.  The trial judge concurred, finding three statutory aggravators and no statutory mitigators, and sentenced Petitioner to death in the electric chair.  The trial court did find one non-statutory mitigator - that Petitioner suffered from "some possible mental abnormalities and has an antisocial personality."  (App. A-11 at 1313.)[2]

---

[1] The Supreme Court of Florida's opinion disposing of Petitioner's direct appeal contains a thorough recitation of the facts of the case.  *Carroll v. State*, 636 So. 2d 1316, 1317 (Fla. 1994).

[2] References to the record will be made by citing to the particular volume and page of Respondents' Advanced Appendix.  For example, "App. A-1 at 2" refers to page two of the volume labeled Exhibit A-1.

During the next thirteen years, the capital appeals process proceeded through the Florida state courts, ending on May 12, 2005, when the Florida Supreme Court affirmed the trial court's denial of Petitioner's successive motion for post-conviction relief. *Carroll v. State*, 904 So. 2d 430 (Fla. 2005). The petition in this Court was filed on June 8, 2005, and is now ripe for determination, almost eighteen years after Christine's death.

Although Petitioner has raised numerous claims in his petition and prior proceedings, the essential dispute revolves around whether his death sentence is precluded under *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is borderline mentally retarded and suffers from a variety of mental illnesses. Petitioner's remaining claims are clearly without merit and deserve little discussion.

## II.     The Governing Legal Principles

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A.     Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

2

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005), *cert. denied*, 127 S. Ct. 348 (2006).  The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable."  *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the

3

presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

### B.      Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[3] *Id*. at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id*. at 689-90.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.  Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.  *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy.  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

---

[3] In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

### III.    The Claims Which Require Little Discussion

#### A.    Claim One

In claim one, Petitioner argues that his Fourth and Fourteenth Amendment rights were violated because certain evidence, obtained after an arrest effected without probable cause, was not suppressed. Petitioner's trial counsel filed a motion to suppress the physical evidence. (App. A-10 at 1088-92.) After conducting an evidentiary hearing, the trial court denied the motion to suppress. (App. A-1 at 3-62.) Petitioner then raised the issue on direct appeal, and the appellate court affirmed the trial court's decision. *Carroll*, 636 So. 2d at 1317-18.

The Supreme Court in *Stone v. Powell,* 428 U.S. 465 (1976), determined that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494 (footnotes omitted). In order to be entitled to federal habeas review of a Fourth Amendment claim, the petitioner must demonstrate that he "was denied an opportunity for a full and fair litigation of that claim at trial and on direct review." *Id.* at 495 n.37; *Mincey v. Head*, 206 F.3d 1106, 1125-26 (11th Cir. 2000). Federal courts will not consider the merits of Fourth Amendment claims merely because the state

courts erred in their Fourth Amendment analysis.  *See Swicegood v. State of Ala.*, 577 F.2d 1322, 1324 (5th Cir. 1978).[4]

Petitioner has failed to demonstrate that the hearing conducted by the trial court on his motion to suppress denied him an opportunity for a full and fair litigation of his Fourth Amendment claim.  This Court finds that Petitioner was afforded a full and fair opportunity to litigate this claim, and he should not be permitted to re-litigate the same issue.  *See Harris v. Dugger,* 874 F.2d 756, 761 (11th Cir. 1989) (federal habeas petitioner, who had fully and fairly litigated his *Franks* claim in the state courts of Florida, was precluded from federal habeas review of this claim); *Boggs v. Bair,* 892 F.2d 1193, 1200 (4th Cir. 1989) (federal habeas petitioner "was afforded every full and fair opportunity to litigate and have adjudicated the Fourth Amendment claim with respect to the search of his vehicle and . . . he should not be permitted to further relitigate the same . . . .").  Therefore, claim one must be denied.

### B.      Claim Three

Petitioner contends that his Sixth and Fourteenth Amendment rights were violated when the State was permitted to elicit testimony concerning his earlier incarceration and accusations that he had molested other children, and to suggest that he would desire to have sex with young children if his mental illness was under control.  Petitioner unsuccessfully raised this claim on direct appeal.

"Federal habeas corpus relief based on evidentiary rulings will not be granted unless it goes to the fundamental fairness of the trial."  *McCoy v. Newsome*, 953 F.2d 1252, 1265 (11th Cir. 1992); *see also Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) ("We review questions of state law

---

[4]All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

in federal habeas proceedings only to determine whether the alleged errors were so critical or important to the outcome of the trial to render 'the entire trial fundamentally unfair.'").  The state trial error must have been "material in the sense of a crucial, critical, highly significant factor." *Tejada*, 941 F.2d at 1560 (quotation omitted) (citations omitted); *see also Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983) (generally, a federal court will not review a state trial judge's ruling with respect to the admissibility of evidence; an erroneous ruling alone does not warrant habeas corpus relief); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 494 (1st Cir. 1989) ("Habeas review does not ordinarily encompass garden variety evidentiary rulings.").

In the present case, Petitioner has not demonstrated that the evidentiary rulings made by the trial court with regard to these matters were erroneous or deprived him of a fundamentally fair trial. The testimony concerning Petitioner's prior incarceration was minimally relevant and subject to objection.  Although the trial court failed to sustain defense counsel's objection to the evidence, this Court agrees with the Florida Supreme Court's determination that the error was harmless beyond a reasonable doubt.

Testimony of the earlier accusations was elicited during cross-examination of one of the defense's psychiatrists.  The information was contained in the medical records reviewed by the psychiatrist when he formed his opinion.  As noted by the Florida Supreme Court, the information in the records upon which the psychiatrist relied was subject to cross-examination by the prosecution.

When the prosecution asked the defense's psychiatrist whether Petitioner would still desire to have sex with young children after his mental illness was in remission, defense counsel objected

and the objection was sustained.  Because the objection was sustained, the trial court did not allow the testimony and Petitioner's constitutional rights were not violated.

Moreover, Petitioner has failed to establish that the alleged errors by the trial court with regard to these matters had a "substantial and injurious effect or influence in determining the [jury's] verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993).  A review of the record reveals that the evidence against Petitioner was considerable.  His DNA was found at the crime scene, the victim's blood was found on his clothing and his penis, and he was found in the vicinity of the victim's father's stolen truck with the keys to the truck in his pocket shortly after the crime took place.  This evidence was adequate to convict Petitioner.

### C.   Claim Four

According to Petitioner, he was denied the effective assistance of counsel during the penalty phase of his trial.  Specifically, Petitioner complains that the defense counsel failed to hire an investigator, failed to obtain a DNA expert,[5] failed to obtain a confidential mental health expert, failed to obtain Petitioner's school records or records of childhood psychological testing, failed to arrange for the mental health experts to conduct follow-up evaluations, failed to have Petitioner tested for brain damage, and failed to contact Petitioner's family or friends who knew him during his formative years.

Petitioner raised this claim in his Rule 3.850 motion.  After conducting an evidentiary hearing on the matter, the state trial court entered a detailed order reviewing pertinent portions of the trial and evidentiary hearing and denying the claim.  (App. C-6 at 1160-66.)  The trial court

---

[5] The allegation that defense counsel failed to obtain a DNA expert is addressed in connection with Claim Six.

specifically found that counsel's decision not to recall the mental health experts who had testified during the guilt phase was based on a legitimate strategy. *Id*. at 1164-65.  Noting that trial counsel could not be "ineffective for failing to present information that was gleaned many years after the trial in this matter especially from records created after trial or from long-lost family members who have now been found by the extensive efforts of CCR," the trial court rejected Petitioner's argument that his counsel failed to investigate mitigating evidence and to provide background information to the experts. *Id*. at 1164.  Finally, the post-conviction judge, who was also the judge who sentenced Petitioner, concluded that Petitioner had not established prejudice because (a) a great deal of the information discussed during the post-conviction proceedings was presented during the guilt phase; (b) the evidence presented at the post-conviction hearing would not have added much; (c) even if the two statutory mitigators which Petitioner tried to establish at the evidentiary hearing had been found at trial, the judge believed the jury would have still recommended the death penalty; and (d) if Petitioner's family and the experts had testified at the penalty phase, there was a good possibility that Petitioner's past history of sexual crimes against young children would have been revealed to the jury in great detail. *Id*. at 1165-66.

Petitioner challenged the trial court's decision on appeal.  In rejecting Petitioner's arguments, the Florida Supreme Court entered a thorough, detailed order, concluding that counsel's decisions were strategic and that, in any event, there was no prejudice to Petitioner. *See Carroll v. State*, 815 So. 2d 601, 614-17 (Fla. 2002).

To determine whether counsel's performance was lacking at the penalty phase, courts must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart v. Secretary,*

*Dept. of Corrections,* 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)).  "[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance. Strategic choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation."  *Lynd v. Terry*, 470 F. 3d 1308, 1316-17 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case. . . ."  *Lynd*, 470 F.3d at 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (holding that representation is deficient when counsel does not conduct sufficient investigation to formulate an adequate life profile of a defendant).

To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, federal courts "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Wiggins v. Smith,* 539 U.S. 510, 534 (2003).  The critical issue is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  This analysis requires the Court to evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings.  *Williams,* 529 U.S. at 397-98.  If "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," *Wiggins*, 539 U.S. at 538, then prejudice has been shown.

Because this issue was adjudicated on the merits in the state court, this Court may grant habeas corpus relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) & (2). The Court is cognizant that it may not substitute its judgment on this issue for judgments made by the state courts. *See Woodford v. Visciotti*, 537 U.S. 1149 (2003) (reversing appellate court's rejection of state court's finding that petitioner was not prejudiced by his counsel's failure to present mitigation evidence at the penalty phase of his trial). This Court may not grant the writ simply because it determines that the state court erroneously or incorrectly applied the correct governing law. *Bell*, 535 U.S. at 694. Relief is only warranted if the state court's application was objectively unreasonable. *Id.*

Petitioner's claims of ineffective assistance of counsel at the penalty phase fall into two broad categories. The first category encompasses counsel's failure to present mitigating background evidence such as sexual abuse; an abusive, dysfunctional family; and alcohol/drug abuse, which was primarily gleaned from family members during the Rule 3.850 proceedings. The second category involves counsel's alleged failure to recall, prepare, and utilize experts to establish mental health mitigating factors.

The Florida Supreme Court found that despite being told by Petitioner that he had no family members who would offer useful mitigation, trial counsel attempted to locate family members, but was unsuccessful. Given the testimony at the Rule 3.850 hearing by the family members who were later located, Petitioner's statements to counsel were not surprising. Petitioner had not seen most of them for nearly ten years before his trial and, in fact, one of the five who testified had not seen

11

Petitioner for nearly thirty years.  In addition, the family members were well-aware of Petitioner's past sexual misconduct involving young children, including an incident involving his own niece.  Thus, Petitioner's belief that his family would not be of assistance was not unfounded.  Given these circumstances, it was not unreasonable for the Florida courts to conclude that counsel's performance regarding the investigation and presentation of background evidence was not deficient.

With regards to the mental health experts, the Florida courts determined that counsel made a strategic decision not to recall at the penalty phase the experts who had testified at length during the guilt phase. "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

The Florida courts' determination was a reasonable application of clearly established federal law that is amply supported by the record and Petitioner has not overcome the presumption of correctness.  During the penalty phase proceedings, the trial judge questioned defense counsel about his decision not to present any witnesses.  On the record, counsel explained his rationale:

> The other witnesses were people that worked out there at the halfway house that knew [Petitioner] while he lived at the halfway house.  Ms. Powell has already testified.  She was the one that runs the halfway house.  There's nobody that wants to say anything about [Petitioner] or the psychiatrists have already testified.  Doctor McMann [sic] has testified.  The other people that were able to render any type of relevant testimony as to his psychiatric condition at around the time of the offense have already testified and I don't want to open up the door to anything I've discussed with him.  He's comfortable in not presenting any further evidence as far as mitigating factors.  The mitigators, the way I see it, deal with his mental condition.

(App. A-8 at 913.)  At the Rule 3.850 evidentiary hearing, defense counsel further explained his decision:

[T]he main witness in the case Dr. [Danziger] . . . was a good witness but was wavering.[6]  I certainly didn't want to put him on the stand and say have him waver, then the ball game was truly over because what he said he had said, and he said it in a nice professional way.

It was my call.  I guess I didn't want to call the same people again just to have them ask the same series of questions maybe in a different way.  I know as a prosecutor I would have enjoyed that, if I was a prosecutor in the case, after you lose the case to call the same witnesses back.  You'd have a field day with something like that.

They had been persuasive, as persuasive as I thought they were going to be as to that.

It was a judgment call and I made it.

(App. C-1 at 118-19.)  In addition, he reiterated that the decision not to present witnesses was strategic: "Yes, it was a tactical decision because I had no one that I could call that I thought would be persuasive."  (App. C-1 at 149.)

The record reflects that defense counsel's concerns about the potential negative consequences associated with recalling the mental health experts to testify during the penalty phase were well-founded, especially in light of the minimal amount of useful information the experts could have provided.  Defense counsel made an informed, reasoned decision not to recall the mental health experts.  This decision was neither unreasonable nor deficient.  *See Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983) (a tactical decision amounts to ineffective assistance of counsel "only if it was so patently unreasonable that no competent attorney would have chosen it").

---

[6] This conclusion is supported by Dr. Danziger's testimony during the guilt phase.  On cross-examination, Dr. Danziger agreed that he offered his "opinion quite candidly with little conviction or certainty, and without much in the way of supporting evidence.  This is probably one of those opinions that is fifty-one percent for and forty-nine percent against.  I offer this opinion, but I say it, again, without much certainty or forcefulness to this conviction due to the difficult nature of this case."  (App. A-6 at 718.)

Furthermore, there is no indication that Petitioner suffered any prejudice as a result of his counsel's alleged inadequacies. As noted by the state trial court, much of the information presented in the Rule 3.850 hearing was also disclosed during Petitioner's trial.  The sentencing jury heard that he only had a seventh grade education, that as a young child he regularly became drunk, that he had been molested at the age of 11 or 12, that he had sustained a head injury, that he had auditory hallucinations, that he thought other people were controlling his mind, that he was hospitalized as psychotic shortly after the murder, and that the night of the murder he was talking to his jacket and acting strangely.  The experts diagnosed Petitioner with schizophrenia, alcoholism, and drug use. In addition, they opined that Petitioner was unable to tell right from wrong and was not legally responsible for his actions.

After hearing and considering the evidence presented at the Rule 3.850 hearing, the state trial court concluded that such evidence

> would not have added much to the evidence presented at trial and this Court finds that the result of the proceeding would not have been different with the additional information . . . .   This Court believes that the jury would have recommended the death penalty even if Defendant's troublesome childhood, alcoholism, and mental state had been explored in lengthy, gritty detail. . . .   This belief holds true even if the two statutory mitigators which Defendant tried to establish at the evidentiary hearing had been found at trial.

(App. C-6 at 1166.)  This Court concurs.  In addition, presentation of the background information would have opened the door to expose the details of Petitioner's past sex crimes against young children, including his niece.  The damaging nature of such information would have negated the mitigating impact of the other evidence presented at the evidentiary hearing.

Having reviewed the record and considered Petitioner's arguments, it is clear that the state courts' decisions regarding these issues were neither contrary to, nor an unreasonable application of,

clearly established federal law.  Petitioner also has not demonstrated that the state courts made an unreasonable determination of the facts.  Here, nothing in the record (or in Petitioner's submissions) suggests that the state court's factual findings were unreasonable.  Further, Petitioner has failed to rebut the presumption of correctness accorded the state court's factual findings.  Accordingly, claim four must be denied under section 2254(d).

### D.      Claim Five

Petitioner contends that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the State admitted DNA evidence and the defense was denied the opportunity to obtain evidence that the DNA was unreliable.

Again, this claim involves an evidentiary matter, and federal habeas relief is not available to address or correct state court evidentiary rulings absent a situation in which the rulings go to the fundamental fairness of the entire trial.  *McCoy*, 953 F.2d at 1265; *Tejada*, 941 F.2d at 1560. Although the DNA evidence in this case was important, Petitioner has not demonstrated that the admission of the evidence was erroneous or deprived him of a fundamentally unfair trial. Furthermore, Petitioner has not shown that the state court's determination of this claim was contrary to or an unreasonable application of clearly established law.

### E.      Claim Six

Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to request the assistance of a DNA expert.  According to Petitioner, "[c]ounsel are ineffective if they fail to petition the court to appoint experts necessary to present a defense."  (Doc. No. 14 at 74-75.) Without identifying what testimony a DNA expert would have offered or how an expert would have been used at trial, Petitioner concludes that "[h]ad Mr. Taylor obtained a DNA expert, it is probable

that the effect of the DNA evidence presented by the state [sic] . . . would have been diminished and/or contradicted." *Id*. at 75.

This claim was raised in Petitioner's Rule 3.850 motion. After conducting an evidentiary hearing, the trial court denied the claim, finding that defense counsel made a strategic decision not to hire a DNA expert and that Petitioner failed to demonstrate prejudice. (App. C-6 at 1172-73.) The Florida Supreme Court agreed and affirmed the denial of this claim.

In considering this claim, the state courts determined that defense counsel made a reasoned, strategic decision not to hire a DNA expert. This finding of fact is entitled to a presumption of correctness by this Court. *Provenzano*, 148 F.3d at 1330. Petitioner has offered no evidence to rebut the presumption. In fact, the record supports the conclusion of the state courts.

Defense counsel testified that he did not really want a DNA expert. (App. C-1 at 155.) Prior to trial, he had taken a DNA seminar and deposed the State's DNA expert. He thought that the DNA evidence was "pretty solid" and he knew that the lab that had performed the work was not under any scrutiny. *Id*. at 155-56. In addition, defense counsel "liked what [he] saw" because he did not think that the State's expert was particularly strong. *Id*. at 156. Thus, counsel made an informed, tactical decision not to pursue retention of a DNA expert.

The state courts' resolution of this claim was neither contrary to nor an unreasonable application of *Strickland*. Furthermore, Petitioner has not demonstrated that the decision was based on an unreasonable determination of the facts.

### F.    Claim Seven

Petitioner also alleges that defense counsel was ineffective in his presentation of an insanity defense. According to Petitioner,

> [d]ue to his attorney's errors, Mr. Carroll's insanity defense was presented without the benefit of his own expert; the State was allowed to present expert testimony devastating to Mr. Carroll's insanity defense – even though these same experts now say they would have testified favorably had trial counsel provided them with available background information; the State's DNA evidence went unrebutted; and key witnesses were unimpeached.

(Doc. No. 14 at 77.)

After conducting an evidentiary hearing, the state trial court rejected this claim. Finding a failure of both prongs of the *Strickland* analysis, the Florida Supreme Court affirmed.

Petitioner has not demonstrated that the Florida Supreme Court's decision regarding this claim was contrary to or an unreasonable application of *Strickland* or that it was based on an unreasonable determination of the facts. Clearly, trial counsel mounted a cogent, thorough, and reasonable defense. His first avenue was to require the State to prove that Petitioner actually committed the crimes in question. He then raised an insanity defense which was supported by two mental health experts appointed by the court. In support of the defense, counsel also presented the testimony of several individuals who witnessed Petitioner's strange and bizarre behavior shortly before the crimes. In addition, he presented the testimony of Dr. McMahon, the psychologist who examined Petitioner approximately 48 hours after the crimes. Dr. McMahon stated that Petitioner was psychotic and experiencing auditory and visual hallucinations when she examined him. Clearly, the record refutes Petitioner's contention that counsel was ineffective in his presentation of an insanity defense and § 2254(d) precludes relief.

## IV.    Claim Two

In claim two, Petitioner argues that his constitutional rights to Due Process and Equal Protection were violated when the trial court failed to grant him an evidentiary hearing on his claim

17

of mental retardation and mental illness in accordance with *Atkins v. Virginia*, 536 U.S. 304 (2002).

(Doc. No. 1 at 9.)  Petitioner raised this claim in a successive Rule 3. 850 motion for post-conviction

relief shortly after the United States Supreme Court issued its ruling in *Atkins*.[7]  *See* App. D-2 at 63.

The state trial judge, having heard all the evidence at trial and at Petitioner's post-conviction hearing

on his first Rule 3.850 motion, denied Petitioner's *Atkins* claim. *Id*. at 126.  The trial court concluded

that Petitioner did not meet the definition of mentally retarded as set forth in *Atkins* because his IQ

"is and was over 75," the cutoff IQ score for the intellectual function prong of the mental retardation

definition.  *Id*. at 133.  Further, the trial court found meritless Petitioner's argument that he should

be exempt from execution because he suffers from mental illness, "an equivalent and equally

paralyzing affliction that must be entitled to the same protections under *Atkins*."  *Id*. at 134.

A.    ***Atkins***

In 2002, the United States Supreme Court held that execution of mentally retarded offenders

constituted "excessive" punishment under the Eighth Amendment to the United States Constitution.

*Atkins*, 536 U.S. 304 (2002).

The *Atkins* Court declined to furnish state and lower federal courts with a definitive legal

definition of "mental retardation" or "mentally retarded," instead offering two clinical definitions as

possible options:

> The American Association on Mental Retardation (AAMR) defines mental
> retardation as follows: "Mental retardation refers to substantial limitations in present

---

[7] In his successive Rule 3.850 motion, Petitioner argued that, pursuant to *Atkins*, he "is exempt from execution under the Eighth Amendment because he is borderline mentally retarded and/or suffering from such severe brain damage and mental limitations that death could never be an appropriate punishment." (App. D-1 at 63.)  The Court notes that Petitioner never maintained in his successive Rule 3.850 motion that he was in fact "mentally retarded," but instead, implicitly argued that *Atkins* should apply to his case.

functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18."

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

*Id*. at 308 n.3 (citations omitted).  The Court stated that an IQ of 75 is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  *Id*. at 309 n.5.  Further, the Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."[8]  *Id*. at 318.

Recognizing that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," the Court left it to the states to develop "appropriate ways to enforce the constitutional restriction."  *Id*. at 17.

---

[8] The Court will refer to this as the *Atkins* definition of mental retardation.  The Court notes that this definition contains three prongs, all of which must be satisfied for a finding of mental retardation: significant subaverage intellectual functioning (prong one) that is accompanied with significant limitations in adaptive functioning/behavior (prong two), which manifested before the age of eighteen (prong three).

### B.      Florida Law on Mental Retardation

Section 921.137 of the Florida Statutes was signed into law on June 12, 2001, prior to the Supreme Court's ruling in *Atkins*.  The statute exempts the mentally retarded from the death penalty and defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18."  Fla. Stat. § 921.137(1) (2008) ("§ 921.137").  The Florida Supreme Court has consistently interpreted the statute's definition of "significantly subaverage general intellectual functioning" to require a defendant seeking exemption from execution to establish that he has an IQ of 70 or below.  *See Phillips v. State*, No. SC06-2554, 2008 Fla. LEXIS 442, at *14 (Fla. March 20, 2008) (citing *Cherry v. State*, 959 So. 2d 702, 711-14 (Fla. 2007) (finding that § 921.137 provides a strict cutoff of an IQ score of 70)); *Jones v. State*, 966 So. 2d 319, 329 (Fla. 2007) ("Under the plain language of the statute, 'significantly subaverage general intellectual functioning' correlates with an IQ of 70 or below."); *Zack v. State*, 911 So. 2d 1190, 1201 (Fla. 2005) (to be exempt from execution under *Atkins*, a defendant must meet Florida's standard for mental retardation, which requires he establish that he has an IQ of 70 or below).  However, § 921.137 does not apply to a defendant who was sentenced to death before the statute came into effect.  *See* Fla. Stat. § 921.137(8) (2008).  Because Petitioner was sentenced in 1992 the statute is inapplicable, and thus, it is only within the context of the *Atkins*' mental retardation definition that this Court evaluates Petitioner's claim.

### C.      Petitioner's Mental Retardation Argument

Petitioner contends that he should have been given an evidentiary hearing in state court to litigate his claim of mental retardation.  (Doc. No. 14 at 32.)  In response, Respondents assert that

Petitioner's mental state was fully litigated in the state courts, and it was clearly demonstrated that he is not mentally retarded. (Doc. No. 19 at 23.) Therefore, Respondents maintain, Petitioner was not entitled to an additional hearing to develop his mental retardation claim. *Id*. Additionally, Respondents argue that the state court's findings of fact are supported by the record, and these findings are presumed correct pursuant to § 2254(e) because Petitioner has failed to show by clear and convincing evidence that these findings are incorrect or unreasonable. *Id*. at 24.

### 1.    Intellectual Functioning

As noted before, Petitioner's claim that he cannot be executed under the confines of *Atkins* was raised in his successive Rule 3.850 motion. In assessing this claim, the state trial court concluded that Petitioner did not meet the definition of mentally retarded as set forth in *Atkins* "because his IQ is and was over 75." (App. D-2 at 133.) Respondents are correct that this finding of fact is entitled to a presumption of correctness in this Court pursuant to 28 U.S.C. § 2254(e) unless controverted by Petitioner by clear and convincing evidence. As discussed below, Petitioner has failed to meet this burden.[9]

During Petitioner's trial, a total of five mental health experts testified; three were called by the defense and two by the State.[10] While the majority of their testimony concerned Petitioner's mental state at the time of the offense, Dr. Gutman and Dr. Benson briefly testified about Petitioner's intellectual functioning. Dr. Gutman testified that Petitioner was in the high average range of

---

[9] The Court views Petitioner's standard of intellectual functioning as an issue of fact entitled to deference under 28 U.S.C. § 2254(e). *See Moore v. Quarterman*, No. 4:07-cv-077-A, 2007 U.S. Dist. LEXIS 49024, at *20 (N.D. Tex. July 6, 2007).

[10] The defense called Dr. Jeffrey Danziger, Dr. Edward Benson, and Dr. Elizabeth McMahon and the State called Dr. Robert Kirkland and Dr. Michael Gutman

intelligence with an IQ around 105 to 110 despite psychological tests which showed Petitioner's IQ to be lower.  (App. A-4 at 512.)  He stated that he believed the inconsistencies in Petitioner's IQ scores were explained by Petitioner's distortion of the answers so that the evaluator would reach certain responses indicating Petitioner had a low IQ.  *Id.*  Dr. Benson, Petitioner's expert, testified that Petitioner had a "borderline intelligence quotient, by previous psychological tests which showed at 79 some years past when he was regressed."  (App. A-6 at 758.)

Even though mental retardation was not at issue in Petitioner's first post-conviction proceeding,[11] several mental health experts testified about his intellectual functioning during the post-conviction evidentiary hearing.  Dr. Gutman noted that Petitioner's school records showed that his IQ ranged from 80, to the 75 to 85 range when he was child, and Dr. McMahon stated that she believed Petitioner was not a very bright individual.  (App. C-2 at 317, 392.)  However, Dr. Crown, a mental health expert called by the defense, provided the most information regarding Petitioner's intellectual functioning.  Specifically, Dr. Crown testified on direct examination as follows:

Q:      What was, what did you find as a result of your testing?

A:      First, looking at his ability to process information, or in terms of I.Q., his full scale I.Q. was, or is 81.  That would place him at the tenth percentile.  In terms of where we place that in the range, that would be considered in the border-line range, which is this nether land between mentally retarded and being low average.  The tenth percentile, this means, of course, 90 out of 100 people would do better than [Petitioner].

What I did find was that, that his range in terms of functioning was quite dramatic, going from the first percentile up to the 83rd percentile in some, some levels of function.

_____

[11] Petitioner did not raise mental retardation as a bar to execution in his first Rule 3.850 motion.

22

His verbal I.Q. is 84, performance I.Q. 79.  When I look at his intellectual efficiency, meaning given this 81 I.Q., how well does he use the intelligence, so to speak.  His tests, conversion formulas indicate that he was actually functioning, or had an age equivalency of roughly 11 years and five months.

So we could expect him to be problem solving at about the level of someone who's 11 years and five months old, pre-adolescent.

*Id.* at 229.

Q:      Dr. Crown, when you looked at those records contained in the background pack, was there anything in there you found significant?

A:      There were a number of things that, that I found significant.  But in terms of my own, my own reading and understanding, they're expressing concerns from some of the other doctors that examined him in terms of issues of possible malingering.

What was most important to me was to look at records that went back as far as possible.  And I did locate records of psychological testing that were conducted on [Petitioner] when he was 12 and 13 years old.  And those produced the same numbers, the same scores that, that I find; they were in the same, same reference group with a minimal variance.  And there's a great deal of similarity in terms of those identified functions.

Q:      You indicated that the school records you looked to - - and specifically what would that be under?

A:      They are records of psychological testing conducted on [Petitioner] at Clermont Elementary School when he was in the fifth grade when he was 12 years, two months old.  The test was administered on October seventh of 1968.  He was given the Weschler Intelligence Scale for Children, which, which is the standard, was the standard test that was used in '96 [sic].

It yielded a full-scale I.Q. of 80.  My full scale I.Q. was 81.  There's a correct variance of 15 points.  Allowing this is a one point difference, 81, it's highly unlikely that someone could fake that number on a deliberate basis beginning when they were 12 years old.

Q:      You are aware after looking at the other, there's been other I.Q. testing by other doctors?

A:      Yes.

23

Q:      You're aware there has been a fairly wide range of I.Q.'s found?

A:      Well, from, from test to test, the tests were repeated one year later when he
        was 13.  And he had a full scale I.Q. when he was 13 of 80.  I'm aware of
        another test that produced a verbal I.Q. of 58.  That was the, these were done
        in, I believe, '90.

Q:      Why do you think it was so much lower?

A:      I believe it was so much lower because at the time [Petitioner] was psychotic.
        And psychotic individuals tend not to be able to attend to task and tend to
        produce extremely diminished scores.  Which, which means that a person
        who was floridly psychotic is not a good candidate for that type of cognitive
        testing because being psychotic, a psychosis is a thought disorder.

        What we are in simple terms doing when looking at intellectual and cognitive
        functioning is measuring thinking.  If someone is psychotic the thinking is,
        of course, going to be disordered and disorganized and going to produce
        scores below what the possible expectancy levels might be.  So it's highly
        likely that someone that is in the midst of a psychotic episode is going to
        produce low scores.

Q:      Based on your experience in dealing with people who have psychosis of some
        sorts, would this be fairly normal, for someone to test lower - -

A:      Yes.

Q:      - - on an I.Q. test?

A:      Certainly.

Q:      Is it your opinion when you administered the test that you gave [Petitioner]
        which resulted in a verbal I.Q. of 81, did you feel he was trying on the test?

A:      Certainly.

Q:      Did you feel at any time, in your opinion, or based on what you've seen about
        other people, he was malingering, or trying to do badly on the test?

A:      Not at all.

Q:   So in your opinion based on records you've seen of all the I.Q. scores taken together, your testimony is that, or is it your testimony that it seems your test, testing is fairly congruent with other testing that's been done at a younger age?

A:   It's consistent with and coupled with that, and is the best longitudinal reference point for [Petitioner's] intellectual and cognitive ability.  It's been able to maintain itself over a 27-year-period.

*Id*. at 23 -39.  During the States' cross-examination of Dr. Crown, the following exchange occurred:

Q:   Now, I believe you testified on direct that your assessment is that [Petitioner's] I.Q. is overall 81?

A:   The full scale I.Q. is 81, that is correct, Ms. Coffman.

Q:   Are you aware that testimony was adduced at the trial of this case indicating his overall I.Q. was only 79?

A:   There's no difference between 79 and 81.  Statistically, there's a variance of 15 points.  I saw 81, it's really plus/minus 15, so 79 is statistically the same as 81.

Q:   What is the cutoff for borderline retardation?

A:   Below one standard deviation, one standard deviation.  The area below 85 would move in the borderline range.

Q:   Cutoff for borderline, whatever falls below that?

A:   Next would be mental retardation; depending on the definition we use, would be an I.Q. area of 69 or 74.

Q:   Which definition do you use?

A:   Current definition, the one that's accepted under present standard nomenclature is 74.  That's the American Sovereign's Mental Deficiency definition.

*Id*. at 257-58.

Given the substantial variance of test scores reported, Petitioner asserts that the trial court should have granted him an evidentiary hearing to "explore the explanations as to those varying scores." (Doc. No. 14 at 38.)  Petitioner notes that none of the mental health experts who testified were requested to review Petitioner in the context of mental retardation, and all of his reported scores were testified to outside of the criteria necessary to determine whether he was mentally retarded.  *Id*. at 38-39.

The trial court's conclusion that Petitioner is not mentally retarded was the product of a reasonable application of the *Atkins* criteria to the evidence presented during Petitioner's trial and post-conviction evidentiary hearing.  The trial court stated "it seems clear that . . . subaverage intellectual functioning requires an IQ score of 75 (at most) or below."  (App. D-2 at 131.)  In reaching its decision, the trial court considered that (1) Petitioner's school records showed IQs in the 75 to 85 range; (2) the only mention of an IQ score falling below 75 was a verbal IQ score of 58 obtained immediately following his arrest at a time when he was believed to be psychotic; and (3) he has consistently achieved IQ scores in the 79 to 81 range since his initial IQ test after his arrest. *Id*. at 132-33.

In sum, the record supports the trial court's finding that Petitioner's IQ is over 75, and Petitioner has failed to rebut this finding by clear and convincing evidence.  In fact, Petitioner's own expert, Dr. Crown, testified that Petitioner's full scale IQ is 81.  *See supra*.  Petitioner has not presented any additional information to this Court that he did not present before the state court when it concluded that he did not satisfy the first prong of *Atkins*.  Instead, Petitioner has merely alleged in a conclusory fashion that he has scored a 75 on his most recent IQ test and that he was "functionally mentally retarded" at the time of the offense due to his psychosis.  (Doc. No. 14 at 39.)

Even if Petitioner in fact scored a 75 on his most recent IQ test, conclusory allegations are not enough to support habeas relief. *See Tejada*, 941 F.2d at 1559. Further, Petitioner's contention that he is ineligible for the death penalty under *Atkins* because he was "functionally mentally retarded" at the time of the offense is not well-taken. As noted *supra*, *Atkins* protects only those individuals who are mentally retarded, not those who are psychotic and produce a qualifying IQ only for a limited period of time. Indeed, under *Atkins*, the mental retardation must have manifestly developed by the age of 18. Petitioner's arguments do not controvert the trial court's finding by clear and convincing *evidence*. Therefore, the state court's determination that Petitioner's IQ is over 75 must be presumed correct.

Additionally, the Court notes that Petitioner contends that *Atkins* should apply to him because he is "borderline mentally retarded." While the record does suggest that Petitioner may in fact be "borderline mentally retarded" according to the definition of "borderline intellectual functioning" found in the DSM-IV-TR,[12] *Atkins* applies only to those individuals who are "mentally retarded." As the Court has already explained, this requires an IQ of, at most, 75.

### 2. Deficits in Adaptive Behavior Manifested Before Age 18

---

[12] The term "borderline mentally retarded" does not have a clinical definition. However, the DSM-IV-TR recognizes that "Borderline Intellectual Functioning" is associated with an IQ in the 71 to 84 range. *See* American Psychiatric Association, Diagnostic and Statistical Manual ("DSM-IV-TR") (text rev. 4th ed. 2000) at 740. While the DSM-IV-TR does not provide a clinical definition of "borderline mental retardation," it does state that "[d]ifferential diagnosis between Borderline Intellectual Functioning and Mental Retardation (an IQ of 70 or below) is especially difficult when the coexistence of certain mental disorders (e.g., Schizophrenia) [are] involved." *Id*. Furthermore, it provides that "an IQ score may involve a measurement error of approximately 5 points, depending on the testing instrument. Thus, it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation." *Id*. at 48.

Because the trial court concluded that Petitioner's intellectual functioning was not significantly subaverage pursuant to *Atkins*, the court was not required to address the remaining two prongs of the mental retardation definition.   *See supra* n.7.   Nevertheless, the trial court concluded that Petitioner also failed to demonstrate deficits in adaptive functioning sufficient for a diagnosis of mental retardation.   Specifically, the court stated:

> Additionally, the testimony presented at trial and at the prior postconviction proceedings showed no "significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." While [Petitioner]'s childhood was difficult and unusual, there was no evidence presented which showed that [Petitioner] had not adapted to his environment. Rather, testimony showed that initially [Petitioner] made A's and B's in elementary school which negates any inference that [Petitioner] could be mentally retarded.

(App. D-2 at 133) (internal citations omitted).

Petitioner contends that the adaptive behavior prong of the mental retardation definition is more important than using IQ scores to determine whether an individual is mentally retarded.   (Doc. No. 14 at 46.)   He asserts that no evidence of his adaptive behavior was presented at his trial or at his post-conviction evidentiary hearing, and the trial court could not have made a well-informed conclusion that he is not mentally retarded without giving him a chance to fully develop this prong in an evidentiary hearing.   *Id*.   Further, he states that the trial court applied the wrong standard of adaptive behavior when it considered and rejected his claim.   *Id*. at 47.

While the trial court may have summarily concluded, with little discussion, that Petitioner showed no limitations in adaptive functioning, it had already found that Petitioner was not mentally retarded pursuant to *Atkins* because he could not satisfy the first prong of the mental retardation definition.   Thus, even assuming Petitioner could have established that he suffers from significant deficits in adaptive functioning, his *Atkins* claim still would have failed.   Because there is ample

evidence to conclude that Petitioner is not mentally retarded within the framework of *Atkins*, and

Petitioner failed to establish by clear and convincing evidence otherwise, this Court concludes that

the state trial court's resolution of Petitioner's claim was not contrary to, nor an unreasonable

application of, clearly established federal law.   Furthermore, the state court's finding was not

unreasonable in light of the substantial evidence supporting its conclusion.   Thus, Petitioner's claim

is without merit.

### D.   Petitioner's Equal Protection Argument

Petitioner argues that even if he does not fall into the "technical" definition of mentally

retarded, he should be exempted from capital punishment because he suffers from severe mental

illness, which manifested itself before his eighteenth birthday, and because he was psychotic at the

time of the offense.   (Doc. No. 14 at 49.)   In support of this argument, Petitioner contends that

individuals who are mentally ill suffer from many of the same deficiencies as individuals who are

mentally retarded, and therefore, they should be treated similarly in the eyes of the law.   *Id*.

Petitioner raised this issue in his successive Rule 3.850 motion, and the state trial court

rejected it as follows:

> While Defendant couches this successive postconviction motion in terms of mental
> retardation based on <u>Atkins</u>, he seeks to have the holding in <u>Atkins</u> extended to the
> mentally ill in addition to the mentally retarded.   Importantly, Defendant states
> "[a]lthough Mr. Carroll may not fall within the technical definition of mental
> retardation, he suffers from an equivalent and equally paralyzing affliction that must
> be entitled to the same protections under <u>Atkins</u> and the Eighth Amendment."   There
> is, however, no need for the <u>Atkins</u> decision to be applied to the mentally ill because
> the Supreme Court has already held that the eighth [sic] amendment [sic] of [sic] the
> United States Constitution prohibits the execution of insane prisoners and there are
> already numerous safeguards in place for the protection of the truly insane.

(App. D-2 at 133-34) (internal citations omitted).

29

Petitioner contends that the state court misconstrued his claim.   (Doc. No. 14 at 49.)
Specifically, Petitioner maintains that the court "simply separate[d] the issue of mental retardation
from mental illness" and failed to discuss its application.   *Id.*   Further, he asserts that the protection
in place for the "truly insane" to which the trial court cited, "only applies in a post-warrant situation
to anyone, whether mentally retarded or mentally ill . . . ; [h]owever, the *Atkins* standard is based
upon a particular mental condition . . . not [ ] state of mind at the time of execution."   *Id.* at 50.
Finally, Petitioner argues that the analysis in *Atkins* remains the same when "mentally ill" is
substituted for "mentally retarded."   *Id.* at 53.   Hence, Petitioner contends that *Atkins* must be
extended to the mentally ill.   *Id.*   Respondents assert that Petitioner has failed to cite any federal law
which affords him relief.   (Doc. No. 19 at 31.)

### 1.        The Instant Case

Because this issue was adjudicated on the merits in state court, this Court may grant habeas
corpus relief only if the state court's decision "was contrary to, or involved an unreasonable
application of, clearly established Federal law" or "was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1)
& (2).

It appears from the record that Petitioner does, in fact, suffer from some form of mental
illness.  The record reflects that Petitioner's childhood was filled with physical, sexual, alcohol, and
drug abuse.  *See generally* App. C-1 at 180-203, 210-19, 271-93, 302-10.  The mental health experts
who evaluated Petitioner diagnosed him with a myriad of mental disorders including schizophrenia
(App. A-6 at 758, 763-64, 793-94); psychosis (App. A-6 at 789), (App. C-2 at 316-17, 359); fetal
alcohol syndrome (App. C-2 at 245-46); brain damage (App. C-2 at 233, 352, 393); psychosexual

disorder (App. C-2 at 387); and personality disorder (App. C-2 at 352, 357, 387).   However, Petitioner's "illness" does not include mental retardation within the scope of *Atkins*, and as discussed more fully *infra*, there is no United States Supreme Court precedent establishing an exemption to the death penalty for mentally ill offenders who are not considered "insane".

### 2.        The Supreme Court's Analysis in *Atkins* Applied to the Mentally Ill

Since 1976, the United States Supreme Court has carved out exemptions from capital punishment for the "insane" (*Ford v. Wainwright*, 477 U.S. 399 (1986)), juveniles who commit crimes while under the age of eighteen (*Roper v. Simmons,* 543 U.S. 551 (2005)), and individuals who are mentally retarded (*Atkins v. Virginia*, 536 U.S. 304 (2002)).   In light of these exemptions, it has been suggested that there is no rational basis for imposing the death penalty on individuals with mental illness.[13]

In reaching its decision, the *Atkins* Court first noted that a large number of states which utilize the death penalty had enacted prohibitions against executing mentally retarded individuals and

---

[13] Many judges presiding over capital cases have expressed doubt in non-majority opinions as to the appropriateness of executing people with severe mental disorders. *See Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002) (Justice Rucker dissenting to opinion affirming death sentence because "the underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions for the seriously mentally ill, namely evolving standards of decency."); *State v. Nelson*, 803 A.2d 1, 123 (N.J. 2002) (Justice Zazzali reasoning in his concurrence that "if the culpability of the average murderer is insufficient to invoke the death penalty as our most extreme sanction, then the lesser culpability of Nelson, given her history of mental illness and its connection to her crimes, 'surely does not merit that form of retribution.'"); *State v. Scott*, 748 N.E. 2d 11 (Ohio 2001) (Justice Pfeifer dissenting to opinion affirming a death sentence for a schizophrenic defendant based on evolving standards of decency). *See also*, Laurie T. Izutsu, *Applying Atkins v. Virginia to Capital Defendants with Severe Mental Illness*, 70 Brook. L. Rev. 995 (2005); Liliana Lyra Jubilut, *Death Penalty and Mental Illness: The Challenge of Reconciling Human Rights, Criminal Law, and Psychiatric Standards*, 6 Seattle J. Soc. Just. 353 (2007); Helen Shin, *Is the Death of the Death Penalty Near?  The Impact of Atkins and Roper on the Future of Capital Punishment for Mentally Ill Defendants*, 76 Fordham L. Rev. 465 (2007); Christopher Slobogin, *What Atkins Could Mean for People With Mental Illness*, 33 N.M. L. Rev. 293 (2003).

that even those states which had no such prohibition, rarely imposed such executions.  536 U.S. at 315-16.  The Court stated that current legislation and practices provided "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal."  *Id*. at 315-16.

The *Atkins* Court also acknowledged that mentally retarded individuals possess certain psychological characteristics that render them less culpable than "the average murderer." *Id*. at 319. Some deficiencies the Court recognized included a reduced capacity to analyze information, communicate with others, abstract from mistakes and learn from experience, logically reason, control impulses, and comprehend human behavior.  *Id*. at 318.  In light of these impairments in cognition, judgment, and volition, the Court stated that mentally retarded offenders "often act on impulse rather than pursuant to a premeditated plan . . . ."  *Id*.  Therefore, "[t]heir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."  *Id*.

Finally, the *Atkins* Court found that mentally retarded individuals suffer significant disadvantages during legal proceedings, which increase their risk of wrongful execution.  *Id*. at 320- 21.  Specifically, the Court found that these defendants are more vulnerable to situations generating false confessions, are unable to provide meaningful assistance to their counsel, have difficulty testifying on their own behalf, and create an unwarranted impression of lack of remorse for their crimes.  *Id*.

The deficiencies and limitations inherent in those who are mentally retarded may also be found in those who, while not retarded, are considered mentally ill.[14]  Indeed, the majority of states

---

[14] *See* DSM-IV-TR at 41 (diagnostic features of mental retardation), 312 (schizophrenia), 329 (delusional disorders), 345-48 (mood disorders), 136 (delirium), 519 (dissociative disorders).

with capital statutes allow a jury to consider the defendant's capacity to appreciate the criminality

of his conduct or to conform his conduct to the requirements of the law.[15]  Likewise, mentally ill

defendants have also been found to suffer disadvantages in legal proceedings because juries may

actually see mental illness as an aggravating factor, rather than a mitigating factor.[16]

However, despite persuasive arguments and strong expert opinions in support of its

application, the extension of *Atkins* to the mentally ill could prove to be difficult to implement.

Unlike mental retardation, mental illness is not as "technically" defined and "scientifically"

diagnosed.  It is a broad and ambiguous term that can encompass a wide array of mental disorders.

Thus, it could be difficult to know where to draw the line.  Furthermore, there is no consensus in

state legislation supporting a categorical exclusion for the mentally ill.

Perhaps someday, law and medical science will develop to a point where mental illness is

recognized as providing an exemption from the death penalty. But that is not the state of the law at

this time, and *Atkins* cannot be read to support Petitioner's position. Accordingly, since the Florida

court's decision was reasonable in light of federal law, Petitioner's claim must be denied.

---

[15] *See* Shin, *supra* n.13, at 495 (noting that "[t]his pattern of inclusion of mental illness provisions in death penalty laws suggests that many states recognize that mental illness can affect a person's culpability").

[16]*See* Deborah T. Fleischaker, *Dead Man Pausing: The Continuing Need for a Nationwide Moratorium on Executions*, 31 Human Rights 14, 18 (2004) (indicating that juries often consider mental illness as an aggravating factor, and "states often fail to monitor or correct the unintended and unfair results of the error"); *see also* Izutsu, *supra* n.13, at 1023-24 (opining that "it is the jurors' perception of the defendant's future dangerousness at sentencing that appears to be the decisive factor in the decision to impose the death penalty, regardless of the level of the defendant's culpability); Slobogin, *supra* n.13, at 305 n.90 ("The research shows that one of the best predictors of a death sentence is assertion of an insanity defense at trial, and that presentation of evidence supporting a claim of extreme mental or emotional stress is much more likely to correlate with a death sentence than a life sentence.").

**V.       Conclusion**

The Court finds that none of the claims raised in the instant petition have merit or require a

hearing in this Court.  Any of Petitioner's allegations not specifically addressed herein are determined

to be without merit.  The Court determines that the petition must be denied and that this case must

be dismissed with prejudice.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.       The Petition for Writ of Habeas Corpus filed by Elmer Leon Carroll (Doc. No. 1) is

**DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.       The Clerk of the Court shall enter judgment accordingly and is directed to close this

case.

**DONE and ORDERED** in Orlando, Florida this 20th day of June, 2008.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record